**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**OCEANA, INC.,**

Plaintiff,

v.

**WILBUR L. ROSS** *in his official capacity as*
*U.S. Secretary of Commerce*, *et al.*,

Defendants.

---

Case No. 17-cv-829 (CRC)

### MEMORANDUM OPINION

The National Marine Fisheries Service ("NMFS" or the "Service") is responsible for

developing management plans to promote the sustainability of particular species of ocean fish.

In 2017, Plaintiff Oceana, Inc. brought a challenge under the Administrative Procedure Act

("APA") to the Service's most recent management plan for one such species: the dusky shark.

The Court granted summary judgment to Oceana and remanded to the agency to consider a

certain type of data that it had overlooked and to re-evaluate the need for remedial accountability

measures in light of the more comprehensive data.  See Oceana, Inc. v. Ross ("Oceana I"), 363

F. Supp. 3d 67 (D.D.C. 2019) (Cooper, J.).  After examining the relevant data on remand, the

Service stuck to its original conclusion that no additional accountability measures were needed.

Oceana now challenges the agency's remand evaluation as arbitrary and capricious under the

APA.  Before reaching the merits of that challenge, the Court must first resolve Oceana's motion

to admit an extra-record declaration from a fisheries scientist that analyzes the agency's remand

evaluation.  The Court will admit portions of the declaration for the limited purpose of

considering whether the agency failed to consider other potential causes of the decline in

reported dusky shark interactions and deaths and deny the motion in all other respects.

I.    **Background**

The Magnuson-Stevens Act ("MSA") tasks the Fisheries Service with preparing

management plans for all "highly migratory" fisheries under its jurisdiction in the Atlantic.  See

16 U.S.C. § 1854(g)(1).[1]  These plans must contain measures which are "necessary and

appropriate for the conservation and management of the fishery, to prevent overfishing and

rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability

of the fishery."  Id. § 1853(a)(1)(A).  Such measures include setting annual catch limits for each

fishery and species of fish.  See 50 C.F.R. § 600.310.

This case concerns the Service's efforts to protect the dusky shark, a species

"[p]articularly vulnerable to . . . human overfishing."  Oceana I, 363 F. Supp. 3d at 72.  The rise

of commercial and recreational shark fisheries in the 1980s and 1990s wiped out much of the

Atlantic's dusky shark stock.  Id. at 71–73.  "A major culprit was bycatch: fishermen didn't want

dusky sharks, but they were catching them anyway while targeting other fish."  Id. at 73; see also

16 U.S.C. § 1802(2) (defining "bycatch" as "fish which are harvested in a fishery, but which are

not sold or kept for personal use, and includes economic discard and regulatory discards").  To

restore the dusky shark population, the Service implemented a series of reforms beginning in

1999, including prohibiting possession of dusky sharks, decreasing the catch limits for non-

prohibited sharks, and implementing time and area closures.  Oceana I, 363 F. Supp. 3d at 73–74.

Despite these reforms, dusky shark stock assessments conducted by the Service persistently

returned bleak results.  Id.

─────────────────────

[1] A "fishery" constitutes "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics" and "any fishing for such stocks."  16 U.S.C. § 1802(13).

The Service's latest plan to address the overfishing and management of dusky sharks takes the form of an amendment—Amendment 5b—to its Highly Migratory Species Fishery Management Plan, which was promulgated as a Final Rule in 2017.  Administrative Record ("A.R.") 7564–94.  Oceana subsequently filed suit challenging Amendment 5b under the APA and MSA.  In March 2019, the Court granted to summary judgment to Oceana.  It concluded that the Service's decision to exclude logbook data (comprehensive catch data reported by commercial fisherman) and to rely exclusively on observer data (catch data collected sporadically by independent observers employed by the Service and stationed on select fishing vessels) "render[ed] its assessment of the dusky shark bycatch problem arbitrary and capricious." Oceana I, 363 F. Supp. 3d at 77–78, 84.  The agency's failure to consider the more comprehensive logbook data made it premature to evaluate its conclusions that dusky shark catch was small and that additional accountability measures were unnecessary.  Id. at 93–94.  The Court therefore remanded to the Service to consider the logbook data and to explain whether it could be used in conjunction with the observer data to estimate dusky shark catch.  Remand Order 1 (Apr. 19, 2019).  The Court also directed the Service to explain whether, considering all of the relevant data, it continues to conclude that additional accountability measures are unnecessary because only a small amount of catch occurs and is unlikely to result in overfishing. Id. at 1–2.

In August 2019, the Service completed its remand analysis and filed a Supplementary Evaluation of Dusky Shark Bycatch Data ("Remand Report").  A.R. 10217–64.  The agency considered raw data on dusky shark interactions and mortalities from three mandatory federal logbook reporting programs—the Highly Migratory Species Logbook ("HMS Logbook"), the Southeast Coastal Fisheries Logbook ("SE Logbook"), and the Northeast Vessel Trip Reports

("NE Logbook"), A.R. 10222–32, 10266–68,[2] and from six mandatory federal observer programs, id. at 10232–38, 10268–69.[3]  The Service concluded that there was no scientifically valid basis for estimating dusky shark catch from the logbook and observer data because of large gaps in the data (resulting from numerous reports of zero annual catches in some fisheries) and because dusky sharks are easily misidentified and are caught infrequently and in varying conditions and circumstances.  Id. at 10253–62.  Opting to rely only on the raw data instead, the agency determined that dusky shark interactions and deaths have sharply declined, that catch is small, occurs primarily in HMS fisheries, and is not likely to result in overfishing, and that no additional accountability measures are needed.  Id. at 10250–53.

Oceana challenges the Remand Report under the APA and MSA.  To support its challenge, Oceana relies on an extra-record declaration from a fisheries scientist that it enlisted to evaluate the scientific validity of the Remand Report.  Before the Court may pass on the merits of Oceana's challenge, it must decide whether to admit that declaration.

## II.   Legal Framework

The APA requires courts to set aside agency action as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]"  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

---

[2] The HMS Logbook and NE Logbook programs require 100 percent of vessels to report, whereas the SE Logbook program randomly selects twenty percent of vessels to report.  A.R. 10224–25, Tables 1 & 2, 10227–28.  The Service concluded that the SE Logbook data could not be validly extrapolated.  Id. at 10227–28, 10259.

[3] The agency also examined raw data from recreational surveys, A.R. 10239–43, 10269–71, seafood dealer programs, id. at 10244–45, 10271–72, and scientific research programs that are exempted from the dusky shark targeting ban, id. at 10245–46, 10272–73.

<u>Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983); 5 U.S.C. § 706(2)(A).[4]  In making that determination, courts are only to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.  The full administrative record consists of "all documents and materials that the agency directly or indirectly considered" in making its decision.  <u>Maritel, Inc. v. Collins</u>, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (internal quotation marks omitted); <u>see also</u> <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971).  These restrictions are necessary to enforce the proscription that "[t]he reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."  <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).

However, "[t]here are two situations in which a plaintiff may seek to add evidence or documents to the administrative record."  <u>Oceana, Inc. v. Ross</u>, 290 F. Supp. 3d 73, 77 (D.D.C. 2018) (Cooper, J.).  "First, a plaintiff may seek to include 'extra-judicial evidence that was not initially before the agency' but that the plaintiff 'believes should nonetheless be included in the administrative record.'"  <u>Id.</u> (quoting <u>Univ. of Colo. Health at Memorial Hosp. v. Burwell</u>, 151 F. Supp. 3d 1, 13 (D.D.C. 2015)).  "Second, a plaintiff may seek to 'include evidence that should have been properly a part of the administrative record but was excluded by the agency.'"  <u>Id.</u> (quoting <u>Univ. of Colo.</u>, 151 F. Supp. 3d at 13).  The parties agree that the declaration at issue, which was created *after* the agency submitted its remand report, qualifies as the former.

---

[4] National Standard 2 of the MSA contains another statutory requirement:  The Service's conservation and management measures must be based on the "best scientific information available."  16 U.S.C. § 1851(a)(2).  Although the Service therefore may not "disregard superior data in reaching its conclusion," a National Standard 2 challenge "will normally fail, unless there is some indication that superior or contrary data was available and that the agency ignored such information."  <u>Guindon v. Pritzker</u>, 31 F. Supp. 3d 169, 195 (D.D.C. 2014) (internal quotation marks omitted).

Oceana must therefore "demonstrate unusual circumstances justifying a departure from th[e] general rule" against judicial consideration of extra-record evidence.  City of Dania Beach v. FAA, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting Tex. Rural Legal Aid v. Legal Servs. Corp., 940 F.2d 685, 698 (D.C. Cir. 1991)); see also Am. Wildlands v. Kempthorne, 530 F.3d 991, 1002 (D.C. Cir. 2008).  The D.C. Circuit has identified three such unusual circumstances: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information [is] needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'"  Dania Beach, 628 F.3d at 590 (quoting Am. Wildlands, 530 F.3d at 1002).[5]  Oceana contends that the second and third circumstances justify the admission of the extra-record evidence at issue here.[6]

---

[5] As other courts in this jurisdiction have noted, the "trend" in the D.C. Circuit has been "towards limiting the circumstances in which district courts may consider evidence outside the administrative record[.]"  United Student Aid Funds, Inc. v. DeVos, 237 F. Supp. 3d 1, 4 (D.D.C. 2017).  In Esch v. Yeutter, 876 F.2d 976 (D.C. Cir. 1989), the Circuit recognized eight "exceptions countenancing use of extra-record evidence."  Id. at 991.  Since then, the Circuit has gradually winnowed the number of circumstances in which courts may consider extra-record evidence to three.  See Dania Beach, 628 F.3d at 590; United Student Aid Funds, 237 F. Supp. 3d at 4 (recognizing the same).

[6] Prior to summary judgment, the Court granted in part and denied in part an earlier motion by Oceana to compel completion and supplementation of the administrative record.  See Oceana, Inc. v. Ross, 290 F. Supp. 3d 73, 86 (D.D.C. 2018) (Cooper, J.).  Oceana sought to supplement the record with three sets of documents that were purportedly before the agency but improperly excluded from the administrative record and to admit one set of extra-record documents.  The Court granted Oceana's request to supplement the record with one set of documents cited in the agency's Environmental Impact Statement and denied its requests to supplement the record with the other two sets of documents.  Id. at 79–85.  The Court also declined to admit extra-record data on dusky shark bycatch and mortality from non-HMS fisheries because Oceana failed to show an "unusual circumstance" justifying its admission.  Id. at 85–86.

### III.  Analysis

Oceana seeks to admit an extra-record declaration from Dr. Murdoch McAllister ("McAllister Declaration"), a fisheries scientist and statistician with experience carrying out stock assessments of various species of ocean fish.  McAllister Decl. ¶¶ 1–6.  Oceana enlisted Dr. McAllister to review the Remand Report and to provide his "opinions and conclusions regarding the Report's use of data, analytical methods, and whether the conclusions made in the Report have an obvious basis in the data presented and accepted scientific and statistical practices."  Id. ¶ 7.  Based on his review, Dr. McAllister attests that "NMFS does not provide the sort of data analyses that are necessary to answer the questions it addresses in its report" and that "[t]he gaps in NMFS's analyses make it impossible to corroborate its conclusions."  Id. ¶¶ 8–9. The declaration also includes illustrative calculations applying "proper analytical methods" to demonstrate that "many of NMFS's conclusions regarding the size and significance of dusky shark bycatch are not verifiable and actually appear to be incorrect."  Id. ¶ 9.

Oceana concedes that the Service never considered the McAllister Declaration—indeed, it was created after the Remand Report.  It nonetheless moves to admit the extra-record declaration as "background information needed to determine whether the agency considered all the relevant factors" and as necessary to facilitate effective judicial review in light of "the agency['s] fail[ure] to explain administrative action so as to frustrate judicial review."  Dania Beach, 628 F.3d at 590 (internal quotation marks omitted).

### A.  "Relevant Factors" Ground

"The 'relevant factors' ground for supplementation comes into play where a party seeks to demonstrate that an agency decision was arbitrary because the agency did not consider some important aspect of the regulatory problem before it."  33 Wright & Miller, Fed. Prac. & Proc. § 8391 (2d ed. 1987).  This ground stems from Overton Park's command that, in conducting

arbitrary and capricious review, "the court must consider whether the [agency's] decision was based on a consideration of the relevant factors." 401 U.S. at 416. A reviewing court may therefore "consider evidence not included in the administrative record to ascertain *whether* the agency considered all factors relevant to its decision." Sw. Ctr. for Biological Diversity v. Babbitt, 131 F. Supp. 2d 1, 7 (D.D.C. 2001) (emphasis added); see also CTS Corp. v. EPA, 759 F.3d 52, 64 (D.C. Cir. 2014) ("[R]esort to extra-record evidence may, for example, help the court to determine whether the administrative record is deficient in the first place."). However, the court may never "substitut[e] . . . [its] determination for the agency's, based on the non-record information." Sw. Ctr. for Biological Diversity, 131 F. Supp. 2d at 8; see also Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 285 (D.C. Cir. 1981) ("Consideration of [extra-record] evidence to determine the correctness or wisdom of the agency's decision is not permitted, even when the court has also examined the administrative record." (internal quotation marks omitted)).

To satisfy the "relevant factors" exception, "the document in question must do more than raise 'nuanced points' about a particular issue; it must point out an '*entirely new*' general subject matter that the defendant agency failed to consider." Pinnacle Armor, Inc. v. United States, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) (quoting In re Delta Smelt Consol. Cases, 09-cv-1053, 2010 WL 2520946, at *5 (E.D. Cal. Feb. 12, 2013)) (emphasis added); see also State Farm, 463 U.S. at 43 (classifying agency action as arbitrary "if the agency . . . *entirely* failed to consider an important aspect of the problem" (emphasis added)). The question then becomes at what "level of generality" courts should "define[] the relevant factor which the agency must consider." Sw. Ctr. for Biological Diversity, 131 F. Supp. 2d at 8. "In a complicated, scientific analysis," another court in this jurisdiction has held, "consideration of the intermediary evidentiary factors which lead to the ultimate conclusion are the very means by which the agency renders its

decision and, generally speaking, any of them can be a 'relevant factor' justifying supplementation of the administrative record if ignored."  Id.

Oceana tries to fit the McAllister Declaration in this mold by arguing that it provides background information needed to show that the agency failed to consider the following "relevant factors": (1) different reporting rates in the logbook data; (2) how comparisons of raw data fit with accepted scientific practice; (3) post-release mortalities; (4) observer coverage and trips per year; and (5) other reasons that could contribute to bycatch declines.  Oceana has not shown, however, that "administrative record is *silent* about" the agency's consideration of the first three factors.  United Student Aid Funds, 237 F. Supp. 3d at 5 (emphasis added) (admitting extra-record declarations on industry practice where "the administrative record [wa]s silent about the existing industry practice at the time [of the agency action]").

As to the first factor, the McAllister Declaration points out that one of the three sources of logbook data—the SE Logbook program—requires only twenty percent of vessels to report, whereas the other two sources require 100 percent reporting, so the agency should have scaled up the SE Logbook data.  McAllister Decl. ¶¶ 12, 26–27.  But, the record reveals this purported deficiency.  As the McAllister Declaration itself acknowledges, id. ¶¶ 28–29, the Remand Report recognizes this difference in reporting rates, see, e.g., A.R. 10222, 10224–25, 10227, 10266–68, and explains why the Service refused to extrapolate the SE Logbook data, see, e.g., id. at 10227–28, 10259.  Dr. McAllister's "disagree[ment]" with the agency "that the [SE Logbook] data cannot be validly extrapolated," McAllister Decl. ¶ 28, does not render his declaration admissible as extra-record evidence.  See Beyond Nuclear v. Dep't of Energy, 233 F. Supp. 3d 40, 48 (D.D.C. 2017) (refusing to admit extra-record expert declarations that were "more akin to conflicting views of specialists").  Where a document "discuss[es] issues . . . that were

considered by the agency" but rejected, "there is no basis to supplement the record with [it]." Am. Wildlands v. Norton, No. 05-cv-1043, 2006 WL 2780702, at *1 (D.D.C. Sept. 21, 2006), aff'd sub nom. Am. Wildlands v. Kempthorne, 530 F.3d 991 (D.C. Cir. 2008).

Oceana also maintains that the McAllister Declaration is necessary to understand the agency's failure to use accepted methodologies for extrapolating catch and bycatch based on uncertain raw data. Pl. Reply 11; McAllister Decl. ¶¶ 18, 33–35. Again, the administrative record shows that the agency acknowledged the existence of these extrapolation methodologies. See, e.g., A.R. 10254 (explaining that the Service "is very familiar with various extrapolation methods using catch data" and acknowledging the "variety of statistical methods [that] may be used when conduction extrapolations"). The Service explained, however, that it could not apply those methodologies with the "minimum level of confidence in the underlying data [needed] for any extrapolations to hold validity" because of certain caveats in the logbook and observer data. Id. at 10254–62. That Dr. McAllister had a "conflicting view[]" concerning the agency's ability to extrapolate from the data provides no basis for admitting his declaration. Beyond Nuclear, 233 F. Supp. 3d at 48.

As for Oceana's contention that the McAllister Declaration is necessary to make sense of the agency's failure to consider post-release mortality rates, see, e.g., Pl. Mot. for Extra-Record Evid. 6; Pl. Reply 13; McAllister Decl. ¶¶ 37–40, Tables 3a, 3b & 4, the Service explicitly acknowledges in its Remand Report that "[t]he mortality tables . . . do not reflect the mortality of fish that are released alive but later die," which "means that actual mortality is some fraction higher than the reported mortality numbers, but less than the total interactions." A.R. 10246. It chose not to "estimate the amount of post-release mortality," however, because "such an approach would not yield scientifically valid results, for the same reasons that extrapolation does

not work in this situation." Id. at 10246–47.  The record is therefore sufficient to show "*whether* the agency considered*" post-release mortalities.  Sw. Ctr. for Biological Diversity, 131 F. Supp. 2d at 7 (emphasis added).

The Court arrives at a different conclusion, however, as to the remaining two factors— the agency's failure to consider observer coverage and trips per year and other reasons that could contribute to bycatch declines.  These two factors amount to the same objection—that the Service failed to account for possible explanations for the reported bycatch declines other than management—so the Court will consider them together.[7]  The Service concluded, based on trends in the raw logbook data, that "reported dusky shark interactions and mortalities have declined substantially since 2000," and that, "[a]ccepting this data at face value, this decline in reported interactions and mortalities is statistically significant."  A.R. 10232.  Dr. McAllister attests that the Remand Report "does not provide sufficient information to determine the likely cause of [these] declines in reported bycatch and mortalities"—*i.e.*, "management versus declining fishing effort or lower dusky shark abundance."  McAllister Decl. ¶ 51.  According to Dr. McAllister, "[a] missing piece of information" is the year-by-year "total number of reported trips for each of the logbook types."  Id.  "Without an indication of how dead discards *per trip* has changed over the years since 2000, observable changes in the number of interactions per year and dead discards per year cannot be disentangled from changes in the number of trips per year."

---

[7] To the extent that Oceana seeks to admit portions of the McAllister Declaration that point out the agency's failure to include reporting coverage and total trips per year for the purpose of calling into question the agency's decision not to extrapolate from the raw logbook and observer data, McAllister Decl. ¶¶ 31–36, that is an impermissible basis for considering extra-record evidence.  See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 255 F. Supp. 3d 101, 125 (D.D.C. 2017) ("Disagreement with an agency's analysis is not enough to warrant the consideration of extra-record evidence, which, after all, is the exception, not the rule." (internal quotation marks omitted)).

Id. (emphasis added).  And, the potential that the declines in reported dusky shark catch and deaths have causes other than management may bear on the agency's conclusions that, at present, dusky shark catch is small, and that, going forward, no additional accountability measures are needed.

The Service responds that "the amount of observer coverage per year and total trips per year are largely irrelevant to [its] analysis in the remand document and Amendment 5b."  Gov't Opp. 19.  But this puts the cart before the horse.  As Oceana points out, Pl. Reply 12, the Service confuses the summary judgment question—whether the agency *should* have considered observer coverage per year and total trips per year—with the admissibility question—whether extra-record evidence is needed to discern *whether* the agency considered observer coverage per year and total trips per year at all.  See Sw. Ctr. for Biological Diversity, 131 F. Supp. 2d at 7 ("[A] court may consider evidence not included in the administrative record to ascertain *whether* the agency considered all factors relevant to its decision[.]" (emphasis added)).[8]

The Service points out that, in any event, the Remand Report included average observer rates and the total number of trips from 2000–2015 for each of the logbook programs.  Gov't Opp. 20 (citing A.R. 10224–35).  Arguably, however, neither figure provides the context necessary to understand the causes of the decline *over time* in dusky shark interactions and mortalities reflected in the raw logbook data as they relate to the agency's conclusions that catch is small and that no additional accountability measures are needed.  The Service's contention that

---

[8] In any case, the Court is not convinced (at this stage at least) that observer coverage per year and total trips per year are irrelevant to the agency's analysis.  Why wouldn't a correlative decline in total trips per year suggest that the decline in dusky shark interactions and mortalities reflected in the raw logbook data is more attributable to a reduction of fishing effort than management?

the record is replete with information demonstrating that it is the agency's management measures that have led to the declines again addresses the wrong question. Gov't Opp. 23 (citing A.R. 7102, Figure 1.3, 4774). The administrative record, as it stands, is completely "silent" as to *whether* the agency considered changes in observer coverage *per year* and total trips *per year* in arriving at that conclusion. United Student Aid Funds, 237 F. Supp. 3d at 5.[9]

The McAllister Declaration points out these gaps in the agency's analysis and explains in detail why, in Dr. McAllister's view, it is necessary to disentangle declines in observer coverage and total trips per year from raw data reflecting declines in dusky shark interactions and mortalities. McAllister Decl. ¶¶ 51–52. The Court will thus admit those portions of the McAllister Declaration for the limited purpose of determining whether the agency failed to consider other potential causes of the reported declines in dusky shark interactions and mortalities in reaching its conclusions that dusky shark catch is small and that no additional accountability measures are needed. See, e.g., Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 218 n.17 (D.D.C. 2005) (admitting an expert declaration that "b[ore] directly on whether the agency considered factors which are relevant to its final decision and purport[ed] to undermine key evidence supporting NMFS's decision" (internal quotation marks and citations omitted)). The Court will permit the agency to submit a declaration from its own expert to address the purported informational gaps in its explanation and analysis that these portions of the McAllister

---

[9] The Remand Report does acknowledge, with respect to the logbook data, that "[g]iven the variability in reporting levels, analyses on a *per trip* basis, rather than the annual numbers themselves, might provide a basis for more direct comparison and be more indicative of the level of impact each fishery has on dusky shark mortality overall." A.R. 10228–29 (emphasis added). But there is no apparent indication in the record why the agency did not perform any such analyses, despite potentially having the underlying data (as indicated by the fact that it was able to calculate the *total* trips from 2000–2015 for each of the logbook data sources, see id. at 10224–25) to do so.

Declaration have highlighted.  <u>See, e.g.</u>, <u>Oceana, Inc. v. Pritzker</u>, 126 F. Supp. 3d 110, 114

(D.D.C. 2015).

      B.  <u>"Failure to Explain" Ground</u>

      Oceana contends, in the alternative, that admission of the McAllister Declaration is

justified on the ground that the "agency failed to explain administrative action so as to frustrate

judicial review."  <u>Dania Beach</u>, 628 F.3d at 590.  "The arbitrary and capricious standard of the

APA 'mandat[es] that an agency . . . provide an explanation that will enable the court to evaluate

the agency's rationale at the time of decision.'"  <u>Sara Lee Corp. v. Am. Bakers Ass'n</u>, 252

F.R.D. 31, 35 (D.D.C. 2008) (quoting <u>Pension Benefit Guaranty Corp. v. LTV Corp.</u>, 496 U.S.

633, 654 (1990)) (first alteration in original).  The Circuit has limited reliance upon this ground

for admission of extra-record evidence to "challenge[s] [to] *gross* procedural deficiencies—such

as where the administrative record itself is so deficient as to preclude effective review."  <u>Hill</u>

<u>Dermaceuticals, Inc. v. FDA</u>, 709 F.3d 44, 47 (D.C. Cir. 2013) (per curiam) (emphasis added).

      Oceana contends that the Service failed to provide enough information or analysis to

allow the Court to understand its conclusions that there was no scientific basis to estimate the

amount of dusky shark catch and that only small amounts of catch occurred.  Pl. Mot. for Extra-

Record Evid. 7; Pl. Reply 16.  But, Oceana has not shown that "the record is so bare that it

prevents effective judicial review" of the agency's conclusions.  <u>Theodore Roosevelt</u>

<u>Conservation P'ship v. Salazar</u>, 616 F.3d 497, 514 (D.C. Cir. 2010) (internal quotation marks

omitted).  The Remand Report provides justifications and technical rationales for the Service's

determination that there is no scientifically valid basis for extrapolating from the logbook or

observer data to estimate dusky shark bycatch.  A.R. 10253–64.  It also explains the reasoning

behind the Service's conclusion, based on the raw logbook and observer data, that the amount of

dusky shark bycatch was small such that additional accountability measures were not needed.  <u>Id.</u>

at 10250–53.  Presented with "sufficient information in the record for the Court to determine

what process the agency followed in reaching its conclusion[s]," it will not admit the McAllister

Declaration on this basis.  Midcoast Fishermen's Ass'n v. Gutierrez, 592 F. Supp. 2d 40, 46

(D.D.C. 2008).

      C.  Lack of Public Comment

      Oceana points to another aspect in which the record is deficient—the lack of a public

comment period prior to the Service's release of the Remand Report.  It invokes Pritzker, in

which Judge Friedman admitted an extra-record declaration in part because "there was no notice

and comment period after remand by th[e] Court."  126 F. Supp. 3d at 113.  The court noted that

"the rarity with which consideration of extra-record evidence occurs stems in part from the fact

that challengers such as Oceana typically have the opportunity to submit such evidence in

conjunction with comments on proposed agency action," but that Oceana lacked that opportunity

on remand.  Id.; see also Evans, 384 F. Supp. 2d at 218 n.17 (finding that an expert's "delay" in

submitting "comments only after the agency [action]" was "understandable, since there was no

public comment period . . . and she only recently became aware of the [agency's] use of the

model").

      As both sides acknowledge, however, lack of opportunity for public comment prior to

agency action is not a freestanding basis for admitting extra-record evidence under Dania Beach,

628 F.3d at 590, and its progeny.  See Gov't Opp. 10–12; Pl. Reply 18 & n.2.  Although lack of a

comment period may render extra-record information more useful to the reviewing court, Pl.

Reply 18, it cannot justify reliance on extra-record evidence that is impermissible under the

APA.  The extra-record evidence at issue in Pritzker consisted of a seven-page declaration that

"only endeavor[ed] to point out gaps" in the agency's "statistical explanation of the relationship

between dredge hours and loggerhead takes"—notably, it "d[id] not purport to fill those gaps."

Pritzker, 126 F. Supp. 3d at 114.  By contrast, the thirty-page McAllister Declaration expressly

disagrees with several of the agency's conclusions, see, e.g., McAllister Decl. ¶ 28

("disagree[ing] that the data cannot be validly extrapolated"), and goes beyond providing

background information necessary to facilitate the Court's determination *whether* the agency

considered relevant factors.  See Envtl. Def. Fund, 657 F.2d at 286 ("[A] judicial venture outside

the record can only serve either as background information, or to determine the presence of the

requisite fullness of the reasons given; and it can never, under Camp v. Pitts, [411 U.S. 138

(1973)], examine the propriety of the decision itself.").  Therefore, the lack of opportunity for

public comment on the Remand Report does not alone justify the admission of the otherwise

impermissible portions of the McAllister Declaration.  See, e.g., Beyond Nuclear, 233 F. Supp.

3d at 48 (refusing to admit extra-record declarations that purported to "demonstrate what

Plaintiffs may have submitted if DOE engaged in a public notice and comment process while

preparing a supplemental EIS").[10]

---

[10] While the McAllister Declaration may very well "feature[] exactly the sort of commentary that parties typically submit to an agency before its action is finalized," Pritzker, 126 F. Supp. 3d at 113, the Court notes that this is not Oceana's "*first* real opportunity . . . to offer such relevant evidence," United Student Aid Funds, 237 F. Supp. 3d at 6 n.4 (emphasis added).  Unlike agency actions that go through no notice-and-comment at all, see, e.g., id. (noting that "no period for notice and comment preceded DOE's amicus brief . . . or the Dear Colleague Letter"), Amendment 5b went through notice-and-comment before promulgation, and Oceana had an opportunity to raise at least some of the concerns raised in the McAllister Declaration during the initial public comment period.  But see Davis v. Pension Ben. Guar. Corp., 815 F. Supp. 2d 283, 290–91 (D.D.C. 2011) (noting that extra-record declarations may be considered where "[n]either the scientists who produced the exhibits, nor the parties proffering them, could have known prior to the challenged agency decisions that the exhibits were needed, because in each case the 'first hint' of the agency's methodology appeared in the challenged decision itself" (citing Evans, 384 F. Supp. 2d at 217 n.17; Sw. Ctr. for Biological Diversity v. Norton, No. 98-cv-934, 2002 WL 1733618, at *7 (D.D.C. July 29, 2002))).

**IV.   Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Oceana's motion

to admit the McAllister Declaration.   A separate order follows.


 

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>April 17, 2020</u>